IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CATHERINE R. BAKER, | ) | CASE NO. 3:12CV1313 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, [1] | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff Catherine R. Baker ("Plaintiff" or "Baker") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act

(the "Act), 42 U.S.C. §§ 416(i) and 423, and Supplemental Security Income ("SSI") under Title

XVI of the Act, 42 U.S.C. § 1381 *et seq.*  Doc. 1.  This case is before the Magistrate Judge

pursuant to the consent of the parties.  Doc. 15.  As discussed below, the final decision of the

Commissioner is **REVERSED and REMANDED** because the Administrative Law Judge failed

to explain the weight she assigned to the opinion of Baker's treating physician and failed to

provide good reasons for discounting that opinion.

## I.  Procedural History

Baker filed an application for SSI on July 20, 2007, and an application for DIB on July

30, 2007, alleging a disability onset date of March 1, 2005.  Tr. 111-12.  She claimed that she

was disabled due to severe pain from the waist down, passing out, and depression.  Tr. 115-18,

124-26.  Baker's applications were denied initially and on reconsideration.  Tr. 111-14.  At

Baker's request, on May 3, 2010, a hearing was held before ALJ Rebekah Ross (the "ALJ").  Tr.

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is hereby substituted for Michael J. Astrue as the Defendant in this case.

46-107.  On July 12, 2010, the ALJ issued a decision finding that Baker was not disabled.  Tr.

29-40.  Baker requested review of the ALJ's decision by the Appeals Council on August 31,

2010. Tr. 25.  On March 22, 2012, the Appeals Council denied review, making the ALJ's

decision the final decision of the Commissioner.  Tr. 1-6.

## II.  Evidence

### A.    Background

Baker was born on July 23, 1975, and was 29 years old on her alleged onset of disability

date and 34 years old on the date of the ALJ's decision.  Tr. 38, 40, 53, 232.  She has a high

school education (Tr. 243) and past relevant work experience as a home health aide, child

monitor, fast food worker, cashier, and assistant manager of a convenience store.  Tr. 38, 99.

During the relevant period, Baker initially lived by herself in a duplex that was owned by her

mother and later moved in with a friend.  Tr. 54-55.

### B.    Medical Evidence

#### 1.    Physical Impairments

##### a.    Treatment History

Baker broke her ankle in 2000.  Tr. 435.  After surgery, her ankle healed well and she

was able to return to work.  Tr. 435.  In 2003, Baker had the pins and plate removed from her

ankle and, since that time, has reported an increase in pain.  Tr. 435.  From January 2, 2005, to

June 29, 2005, Baker treated with Maggie S. Smith, D.P.M., for her left ankle pain.  Tr. 301-07.

Baker was scheduled for surgery on her left ankle on January 6, 2005, but Dr. Smith cancelled

the surgery because Baker's blood pressure was too high and Baker admitted that she was not

regularly taking her blood pressure medication.  Tr. 306.  On February 9, 2005, Dr. Smith noted

that Baker's ankle was stiff but she was doing well with AFO (ankle foot orthosis).  Tr. 305.  Dr.

Smith switched Baker to a different anti-inflammatory medication and limited her work to sitting down "as needed" with limited walking and standing, which appeared to alleviate some of Baker's symptoms.  Tr. 305.  In March 2005, Baker underwent an ankle arthroscopy with synovectomy.  Tr. 304.  At a follow-up appointment on April 12, 2005, Dr. Smith noted that Baker was doing "very well" with weight-bearing in a tennis shoe.  Tr. 303.  Baker reported that she was looking for employment where she did not have the demands of weight-bearing.  Tr. 303.  Dr. Smith prescribed medication and physical therapy.  Tr. 303.  On June 29, 2005, Baker complained of ankle pain but reported that she was not taking her medications due to lack of money.  Tr. 302. Dr. Smith provided her with Mobic samples.  Tr. 302.

On April 15, 2006, Baker presented to Bay Park Community Hospital with complaints of a syncopal episode.[2]  Tr. 313.  Baker reported that the episode happened while she was changing the dressing on her mother's back and that it had never happened before.  Tr. 313.  Baker had a normal physical examination, revealing intact cranial nerves, normal speech, coordination, and appropriate motor strength and sensation in her extremities.  Tr. 313.  A CT scan of Baker's head showed no acute injury or intracranial hemorrhage.  Tr. 312, 314.  An Electrocardiogram ("EKG") and a chest x-ray were also normal.  Tr. 311, 314.  Examining physician John Jewell, M.D., noted that Baker was hypotensive (abnormally low blood pressure) and admitted her for blood pressure monitoring.[3]  Tr. 314.

Baker treated with Mark Young, M.D., from August 2006 through August 2007 for hypertension.  Tr. 418-25.  In January 2007, Dr. Young noted that Baker was taking her medication but not following her prescribed diet.  Tr. 421.

---

[2] Syncope is a medical term used to describe a temporary loss of consciousness due to a sudden decline of blood flow to the brain.  It is commonly called fainting or "passing out." *See* National Institute of Neurological Disorders and Stroke, *available at* http://www.ninds.nih.gov/disorders/syncope/syncope.htm.

[3] Based on the medical records, Baker was hypertensive on an ongoing basis but hypotensive when having syncopal episodes.

On June 10, 2007, Baker presented to St. Charles Hospital with complaints of a syncopal episode. Tr. 351. She reported that she had walked several miles in the heat to her friend's house. Tr. 357. Upon examination, Baker was alert and oriented with grossly intact cranial nerves and no sensory or focal motor deficits. Tr. 355. The examining physician, Nagi A. Bishara, M.D., found that Baker's syncopal episode was related to heat stroke, dehydration, and hypotension. Tr. 357-58. A chest x-ray showed no acute abnormalities and an EKG revealed a normal sinus rhythm. Tr. 352-53, 373. A bilateral venous scan of Baker's lower extremities was negative. Tr. 353. An MRI and a CT scan of Baker's brain were both normal, as was a myocardial test, which showed no evidence of stress-induced ischemia or infarction. Tr. 365-67.

On July 25, 2007, Baker saw Ravi K. Adusumilli, M.D., for a consultation regarding her syncope episodes. Tr. 395. Dr. Adusumilli noted that Baker had extensive diagnostic testing, which was all negative. Tr. 395. He opined that Baker's recurrent syncope was secondary to orthostatic changes[4] and to Diovan medication effects. Tr. 395. He advised Baker to discontinue Diovan and to increase her fluid intake. Tr. 395.

On October 23, 2007, Baker saw Nasser H. Smiley, M.D., for an evaluation of her syncope episodes. Tr. 685-86. Baker reported that she had not experienced any episodes since the summer of 2007. Tr. 684. Dr. Smiley noted that Baker had received extensive diagnostic tests, including a tilt-table study, echocardiogram, and EKG, which were all unremarkable. Tr. 684. He reported that Plaintiff had a normal cardiac examination, exhibited normal muscle strength, and had no spinal abnormalities. Tr. 686. Dr. Smiley concluded that there were no malignant causes for Baker's syncope. Tr. 686.

---

[4] Orthostatic hypotension – also called postural hypotension – is a form of low blood pressure that happens when a person stands up from sitting or lying down. Symptoms include: syncope, feeling lightheaded or dizzy after standing up, and nausea. When low blood pressure is caused by medications, treatment usually involves changing the dose of the medication or stopping it entirely. *See* Orthostatic Hypotension, The Mayo Clinic, *available at* http://www.mayoclinic.com/health/orthostatic-hypotension/DS00997/DSECTION=treatments-and-drugs.

On April 18, 2008, Baker returned to Dr. Bishara for a follow-up regarding her syncope. Tr. 678.  Dr. Bishara concluded that Baker's syncope was probably related to a drop in her blood pressure.  Tr. 678.  She recommended adjusting Baker's medication and advised Baker about strict diet control.  Tr. 678.  Dr. Bishara also noted that Baker refused to have any invasive studies regarding her syncope.

On September 17, 2008, Baker presented for evaluation at Occupational Health Services. Tr. 748-49.  The examining physical therapist reported that Baker's physical evaluation was normal except for tenderness on her lumbar spine.  Tr. 749.  The physical therapist found that Baker was "fit for employment" and recommended that she not lift lift heavy weights and that she use good body mechanics when lifting.  Tr. 749.

Baker continued to experience ankle pain during this time.  A CT scan from September 29, 2008, showed a number of loose bodies in the ankle joint along with degenerative changes. Tr. 590.  On November 10, 2008, Baker underwent arthroscopic surgery on her left ankle to remove the loose bodies.  Tr. 575-77.  Post-operative x-rays in December 2008 of Baker's left ankle and foot showed no acute abnormality.  Tr. 617-18.

On April 17, 2009, Baker presented to the Family Care Podiatry Clinic for follow-up after her left ankle surgery.  Tr. 761.  She reported 5/10 pain (pain at a level of 5 on a scale of 1 to 10) and that she took Naprosyn.  Tr. 761.  Baker also reported that her Richie brace, which she recently modified, helped her and that she wore it every day.  Tr. 761.  The doctor assessed Baker with degenerative joint disease of the left ankle.  Tr. 761.  He offered Baker a steroid injection but Baker declined.  Tr. 761.  The doctor instructed her to continue taking anti-inflammatory over-the-counter medication and wearing the Richie brace.  Tr. 761.

On June 10, 2009, Baker began seeing Vengopala Bommana, M.D., as her primary care physician.  Tr. 718.  Baker informed Dr. Bommana that her current medication was not working. Tr. 718.  Upon examination, Baker exhibited normal strength and tone, albeit with muscle tenderness, and walked with a smooth gait.  Tr. 721.  Dr. Bommana prescribed medication and noted that Baker's hypertension had worsened.  Tr. 722.

On August 12, 2009, Baker saw Dr. Smith and complained of left ankle pain.  Tr. 698. Dr. Smith noted that Baker ambulated with a slightly antalgic gait and wore regular shoes without a brace.  Tr. 698.  Dr. Smith diagnosed Baker with osteoarthritis of the left ankle.  Tr. 698.  An x-ray of Baker's left ankle showed no evidence of fracture or dislocation.  Tr. 699.  A left lower extremity scan was also normal.  Tr. 697.

On October 7, 2009, Baker presented to Dr. Bommana for a follow-up appointment.  Tr. 706.  She complained of multiple sores on both arms and syncope.  Tr. 706.  Upon examination, Baker had a regular heart rate and rhythm without any murmurs, gallops, rubs or abnormal heart sounds.  Tr. 708.  She had intact gait, balance, and posture and no gross motor or sensory deficits in her extremities.  Tr. 708.  Dr. Bommana noted that Baker had not taken her hypertension medications for one week and her symptoms had worsened.  Tr. 708.  She continued Baker's medications.  Tr. 708.

On October 16, 2009, while accompanying her mother to a medical appointment at the University of Toledo Medical Center, Baker complained of syncope after a headache.  Tr. 776. Upon examination thirty minutes later she reported no more syncope.  Tr. 776.  Baker had a regular heart rate with no significant murmurs, rubs, or gallop, and no motor deficits or extremity tenderness.  Tr. 777.  She also had a normal EKG.  Tr. 778.  The examining physician noted that Baker's symptoms improved and she was discharged with instructions to follow up with her

primary care physician.  Tr. 776, 778.

On January 8, 2010, Dr. Bommana completed a "Medical Source Statement: Physical Abilities and Limitations" form for Baker.  Tr. 850-51.  Dr. Bommana noted that Baker had degenerative joint disease causing paraspinal tenderness and that she also experienced moderate to severe low back and ankle pain. Tr. 850-51. Dr. Bommana opined that Baker could stand/walk for 60 minutes at a time for up to 6 hours in an 8-hour workday, could lift and carry less than 5 pounds, could occasionally stoop, could work around hazardous machinery; could frequently climb stairs or steps, balance and twist, and could constantly walk on uneven ground, finger, handle, and reach.  Tr. 850.  She also found that Baker would need to elevate her legs one to two hours in an eight-hour workday due to her "neurocirculatory disorder causing syncope."  Tr. 850.

On February 10, 2010 and April 12, 2010, Baker sought treatment at St. Charles Hospital for syncopal episodes.  Tr. 857, 870.  On both occasions, Baker was oriented times three with a normal affect, insight, and concentration.  Tr. 858, 872.  She had a normal respiratory and cardiovascular examination.  Tr. 858, 871.  Baker had no focal motor or sensory deficits or cerebellar deficits (Tr. 858, 871) and her back, neck, and extremities had a normal range of motion with no tenderness.  Tr. 858, 871.  An EKG from February 2010 was interpreted as normal and an April 2010 EKG showed some non-specific changes with normal sinus, rate, and ST/T waves.  Tr. 860, 874.  Both times she was discharged in stable condition with instructions to follow up with her primary care physician.  Tr. 860, 873-74.

### b.  State Agency Physicians

At the state agency's request, Baker saw Lora L. Thaxton, M.D., for a consultative examination on November 5, 2007.  Tr. 465-79.  Baker complained of problems ambulating, standing, and sitting for long periods of time due to osteoarthritis and ankle pain and instability.

7

Tr. 470.  Upon examination, she had fair strength in all major muscle groups in all four of her extremities and intact sensation throughout.  Tr. 470.  She had decreased range of motion and mild swelling in her ankles but no ligamentous instability.  Tr. 470.  Dr. Thaxton reported that it was difficult to determine the extent of Baker's impairments but opined that Baker would have difficulty with work-related activities including prolonged sitting, standing, walking, lifting, carrying, handling objects, or traveling.  Tr. 471.

On November 29, 2007, state agency physician Eli Perencevich, D.O., reviewed the record, including Dr. Thaxton's report, and completed a Physical Residual Functional Capacity assessment.  Tr. 472-79.  Dr. Perencevich opined that Baker could lift and/or carry 20 pounds occasionally and 10 pounds frequently, could stand and/or walk 6 hours in an 8-hour workday, could sit for 6 hours in an 8-hour workday, could occasionally climb, could never balance or stoop, and should avoid all hazards.  Tr. 473-74.  He also concluded that foot controls should be limited to occasional on the left side.  Tr. 474.

## 2. Mental Impairments

### a. Treatment History

On July 26, 2007, Baker presented to Unison Behavioral Health ("Unison") based on the advice of her case worker at the Department of Job and Family Services.  Tr. 442.  She complained of depression with an onset of 12 years earlier, related in part to having a miscarriage, but reported that she had never received mental health treatment.  Tr. 445.  The examining physician diagnosed Baker with depression (recurrent, moderate) and assessed her with a Global Assessment of Functioning (GAF) score of 65.[5]  Tr. 451.

---

[5]GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some

Baker was seen for a psychiatric evaluation by Usha Salvi, M.D., on August 29, 2007. Tr. 435-40.  Baker reported long-term problems with depression and that she periodically had suicidal thoughts when she was under stress or in a lot of pain.  Tr. 435.  She denied any psychiatric hospitalizations or treatment.  Tr. 436.  Baker reported that she lived in a duplex that was owned by her mother, who paid all of her bills.  Tr. 437.  She also reported that she had a lot of support from friends and extended family.  Tr. 437.  Upon examination, Baker was alert and oriented, had intact recent and remote memory, fair concentration and insight, but limited judgment.  Tr. 438.  Dr. Salvi diagnosed her with dysthmic disorder and major depressive disorder (recurrent, moderate) and assessed her with a GAF of 53.[6]  Tr. 439.  He prescribed medication and noted that Baker was treating with a therapist.  Tr. 440.

Baker received medication management and therapy at Unison from September 2007 through March 2008.  Her mental status examinations were unremarkable.  Tr. 522-38.  For example, on September 26, 2007, Baker had appropriate speech, organized thought process, and a stable mood, though a short attention span.  Tr. 538.  On October 16, 2007, Baker reported that she was doing "okay" and had no medication side effects.  Tr. 535.  On January 1, 2008, Baker exhibited cooperative behavior, appropriate speech, and organized thought process.  Tr. 528. And, on March 14, 2008, Baker reported that Lexapro was working well for her and that it gave her better focus and more energy.  Tr. 522.  Unison discharged Baker from treatment in July 2008 because she often cancelled or failed to show up at appointments.  Tr. 527, 529-30, 539.

On April 15, 2010, Baker sought treatment at St. Charles Hospital because she was having suicidal thoughts.  Tr. 883-84.  She stated that she had not been taking her medication for

difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*

[6] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *See* DSM-IV-TR, at 34.

a long time.  Tr. 884.  She was transferred to Flower Hospital, where she was hospitalized for six

days for major depressive disorder (recurrent, severe, without psychosis).  Tr. 894-95, 903.

Baker improved with medication and supportive therapy and was discharged to follow up at

Unison. Tr. 894-95.  Upon discharge, her GAF was rated at 60.  Tr. 894.

### b.      State Agency Physician

On April 14, 2008, Caroline Lewin, Ph.D., reviewed the record and completed a Mental

RFC Assessment and a Psychiatric Review Technique Form ("PRTF").  Tr. 498-514.  Dr. Lewin

opined that Baker had mild restrictions in activities of daily living, moderate difficulties in

maintaining social functioning, moderate difficulties in maintaining concentration, persistence,

or pace, and no episodes of decompensation.  Tr. 508.  She opined that Baker could interact with

others and perform simple, routine tasks with adequate persistence and pace.  Tr. 514.

### C.      Administrative Hearing

### 1.      Baker's Testimony

On May 3, 2010, Baker appeared with counsel and testified at an administrative hearing

before the ALJ.  Tr. 53-97.  With regard to her physical impairments, Baker testified that she

experienced pain in multiple joints, including her ankles and lower back.  Tr. 64-65.  She

explained that she had surgery on her ankle in 2008 but that it did not improve her pain. Tr. 68-

69.  Baker stated that she wore a brace on her left foot/ankle to help provide support but that she

had problems with the brace because it caused numbness in her foot.  Tr. 69-70.  Baker also

testified that she continued to have high blood pressure and syncope episodes.  Tr. 77.  In the

months prior to the hearing, Baker stated that her syncope episodes had occurred about once

every month.  Tr. 81-82.  She explained that she would faint due to the episodes, which usually

occurred when she stood up too fast.  Tr. 80-82.  Baker stated that her doctor told her that stress

may contribute to her syncope episodes.  Tr. 95.  She also testified that she needed to elevate her legs when sitting to relieve swelling.  Tr. 95.

With regard to her mental impairments, Baker stated that her most significant mental health issue was depression.  Tr. 83.  She stated that she was restarting treatment at Unison and was taking Cymbalta for her depression and Vistaril for anxiety.  Tr. 83-84.  Baker explained that her primary care physician had been prescribing medications for her mental health until she experienced a nervous breakdown the month before and had suicidal thoughts, at which time she was hospitalized for almost one week at St. Charles Hospital and Flower Hospital.  Tr. 85-86; 883-84; 894-95, 903.  Baker stated that Vistaril, which she took for depression, made her very tired.  Tr. 94.

Baker explained that, on a normal day, she used the computer to talk to friends and play games, and that she watched television.  Tr. 90, 265.  She stated that she could go grocery shopping.  Tr. 91.  She also helped do housework, including vacuuming or loading the dishwasher.  Tr. 92.  Baker said that she did not help with laundry because she could not go down the stairs to the basement.  Tr. 92.

### 2.    Vocational Expert's Testimony

Charles McBee (the "VE") appeared at the hearing and testified as a vocational expert. Tr. 97-106.  He stated that Baker had previously worked as a home health aide (semi-skilled position at the medium exertional level), child monitor (semi-skilled position at the medium exertional level), fast food worker (unskilled position at the light exertional level), cashier (unskilled position at the light exertional level), and assistant manager for a convenience store (skilled position at the light exertional level).  Tr. 99-100.  The ALJ asked the VE whether a hypothetical individual with Baker's vocational characteristics and the following limitations

could perform his past work:

> [L]imited to standing, walking a total of six hours in an eight hour day, sitting for six hours; is able to occasionally lift and carry up to 20 pounds, frequently 10 pounds; cannot push with the lower left extremity and only occasionally climb stairs, never climb ropes, ladders, scaffolds; should avoid concentrated exposure to extreme heat; should avoid all exposure to hazards such as machinery and heights. This individual is limited to unskilled work with only occasional changes in the work setting, only occasional judgment and decision making.

Tr. 73. The VE testified that the hypothetical individual could perform Baker's past relevant work as a cashier. Tr. 73-75. In a second hypothetical, the ALJ asked the VE to limit the hypothetical individual to sedentary work. Tr. 102. The VE testified that, with the limitation to sedentary work, the hypothetical individual could not perform any of Baker's past relevant work but could perform other jobs that existed in significant numbers in the national economy, including table worker (1,000 jobs in Ohio and 20,000 jobs nationally), waxer of glass products (500 jobs in Ohio, and 7,500 jobs nationally), surveillance system monitor (1,000 jobs in Ohio, and 25,000 jobs nationally), and telephone quotation clerk (200 jobs in Ohio, and 6,500 jobs nationally). Tr. 102-03.

In a third hypothetical, the ALJ asked the VE to ALJ to consider a person with the following limitations:

> This individual is able to stand/walk at one time up to 60 minutes for a total of six hours in an eight hour work day; can sit at one time for up to four hours for a total of eight hours in a typical work day; can occasionally lift and carry – occasionally or frequently – can only lift or carry less than 5 pounds. And this person can occasionally stoop, frequently balance, frequently twist, frequently climb stairs or steps, frequently operate foot controls, only occasionally work around hazardous machinery, frequently operate a motor vehicle, needs to elevate the legs one to two hours in a workday. And in this particular hypothetical, occasionally is defined as a third of the time and frequently means up to two-thirds of the time.

Tr. 103-04. The VE testified that there are no jobs that this hypothetical person could perform. Tr. 105. The VE explained that it is generally not acceptable for a person to be able to elevate

her legs for one or two hours during the workday.  Tr. 105.

### III.  Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).   In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.   If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

13

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L.

Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this analysis, the claimant has the burden of proof at

Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

The burden shifts to the Commissioner at Step Five to establish whether the claimant has the

residual functional capacity ("RFC") and vocational factors to perform work available in the

national economy.  *Id.*

## IV.  The ALJ's Decision

At Step One of the sequential analysis, the ALJ determined that Baker had not engaged in

substantial gainful activity since March 1, 2005, the alleged onset date.  Tr. 31.  At Step Two,

she found that Baker had the following severe impairments: arthritis and depression.  Tr. 31.  At

Step Three, the ALJ found that Baker did not have an impairment or combination of impairments

that met or medically equaled one of the Listed Impairments in 20 C.F.R. pt. 404, Subpt. P, App.

1.[7]  Tr. 32-33.  The ALJ then determined Baker's RFC and found that she could perform

sedentary work with the following restrictions:

> [C]laimant is not able to climb ladders, rope or scaffolds, to be exposed to hazards
> such as unprotected heights or moving machinery and she must avoid exposure to
> extreme heat.  The claimant should only be required to climb stairs occasionally.
> Because of her limitations with respect to detailed instructions, the claimant
> should be required to perform unskilled work that requires only occasional
> judgment and decision-making.

Tr. 33.  At Step Four, the ALJ found that Baker could not perform her past relevant work.  Tr.

38.  At Step Five, after considering her vocational factors, RFC, and the evidence from the VE,

the ALJ found that Baker was capable of performing the requirements of unskilled sedentary

---

[7]  The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P,
App. 1, and describes impairments for each of the major body systems that the Social Security Administration
considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age,
education, or work experience.  20 C.F.R. § 404.1525.

occupations that existed in significant numbers in the national economy, such as table worker, waxer of glass products, surveillance system monitor, and telephone quotation clerk.  Tr. 39. Thus, the ALJ concluded that Baker was not disabled.  Tr. 40.

## V.  Arguments of the Parties

Baker objects to the ALJ's decision on two grounds.  First, she argues that the ALJ erred in failing to describe the weight he gave to the opinion of her treating physician and failing to explain the reasons for why the ALJ apparently rejected that opinion.  Second, Baker contends that the ALJ failed to adequately explain the basis for her RFC determination, including describing the weight that she gave to the opinion of the state agency consulting physician.

In response, the Commissioner asserts that substantial evidence supports the ALJ's decision.  In particular, the Commissioner argues that substantial evidence supports the ALJ's RFC determination and that the ALJ properly evaluated the medical opinion evidence.

## VI.  Law & Analysis

### A.  Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the

evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.      The ALJ Failed to Evaluate Properly the Opinion of Baker's Treating Physician**

Baker contends that the ALJ erred because she did not expressly state the weight she assigned to the opinion of Baker's treating physician, Dr. Bommana, or provide a sufficient explanation as to why she rejected Dr. Bommana's opinion.  Reviewing the record as a whole, the undersigned finds that the ALJ erred because she failed to explain adequately why she rejected the opinion of Dr. Bommana.

Under the treating physician rule, the opinion of a treating source is entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If the opinion of a treating source is not accorded controlling weight, an ALJ must consider certain factors in determining what weight to give the opinion, such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(d), 416.927(d).

If an ALJ assigns less than controlling weight to a treating source's opinion, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544.  However, the ALJ is not obliged to explain the weight afforded to each and every factor that might pertain to the medical source opinions.  *See Francis v. Comm'r of Soc. Sec.*, 414 F. App'x. 802, 804 (6th Cir. 2011); *Allen v. Commissioner of Social Security*, 561 F.3d 646, 651 (6th Cir. 2009) (even a "brief" ALJ statement identifying such factors will be found adequate to articulate "good reasons" to discount a treating physician's opinion).

As discussed above, Dr. Bommana completed a medical source statement regarding Baker's physical abilities and limitations.  Tr. 850-51.  She found that Baker had degenerative joint disease that caused paraspinal tenderness and that Baker also experienced moderate to severe low back and ankle pain.  Tr. 850-51.  She opined that Baker could stand/walk for 60 minutes at a time for up to 6 hours in an 8-hour workday, could lift and carry less than 5 pounds, could occasionally stoop, could work around hazardous machinery, could frequently climb stairs or steps, balance and twist, and could constantly walk on uneven ground, finger, handle, and reach.  Tr. 850.  She also opined that Baker would need to elevate her legs for one to two hours in an eight-hour workday due to her "neurocirculatory disorder causing syncope." Tr. 850.

Upon review, the undersigned concludes that the ALJ's treatment of Dr. Bommana's opinion necessitates remand because it was inadequate under the treating physician rule. Although the ALJ did acknowledge Dr. Bommana's opinion in her RFC analysis, she failed to describe the weight she assigned to Dr. Bommana's opinions with regard to Baker's functional abilities and limitations.  Tr. 36.  The ALJ's RFC determination makes apparent that the ALJ rejected Dr. Bommana's opinions as to Baker's functional abilities and limitations.  However,

the ALJ did not set forth any explanation as to why she rejected the opinions and provided no further analysis of the opinions in her decision.

Under the treating physician rule, Dr. Bommana's opinions with regard to Baker's functional abilities and limitations were entitled to controlling weight as long as they were medically supported and were consistent with the other evidence in the record.  *Wilson*, 378 F.3d at 544; 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).  The ALJ's failure to identify the reasons for discounting a treating source's opinion and to explain precisely how those reasons affected the weight given to the treating source's opinion signifies a lack of substantial evidence.  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 407 (6th Cir. 2009).  This holds true even where the conclusion of the ALJ may be justified based upon the record.  *Id*.  The Sixth Circuit has repeatedly cautioned that courts "will not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion, and . . . will continue remanding when encounter[ing] opinions from ALJs that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion."  *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (quoting *Wilson*, 378 F.3d at 545).  The ALJ's failure to provide any explanation as to why she rejected the opinion of Dr. Bommana and her failure to give good reasons for disregarding those opinions are procedural errors that denote a lack of substantial evidence supporting the ALJ's decision.

Based on the record and the arguments made by the Commissioner, it appears that the ALJ rejected Dr. Bommana's opinion on the basis that it was inconsistent with other evidence in the record.  However, "it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end

18

of the stick." *Friend v. Commissioner,* 375 Fed. Appx. 543, 552 (6th Cir. April 28, 2010). The

Court does not believe that the administrative decision in this case clearly articulates, in a way

that would satisfy the requirements of Section 404.1527(d) and the Sixth Circuit's decisions in

cases such as *Wilson, supra,* what evidence contradicted Dr. Bommana's findings, how much

weight was assigned to Dr. Bommana's opinion, and the reasons for that assignment.  Remand is

therefore appropriate so that the ALJ can properly evaluate Dr. Bommana's opinion under the

treating physician rule.

Further, the error committed by the ALJ in this case was not harmless.  Application of

harmless error may be appropriate where the review of a decision as a whole leads to the

conclusion that no reasonable fact finder, following the correct procedure, could have resolved

the factual matter in another manner.  *See Hufstetler v. Comm'r of Soc. Sec.*, 2011 U.S. Dist.

LEXIS 64298, *26-27 (N.D. Ohio June 17, 2011).  Here, Dr. Bommana opined that Baker could

stand/walk for 60 minutes at a time for up to 6 hours in an 8-hour workday, could only lift and

carry less than 5 pounds, and would need to elevate her legs for one to two hours in an eight-hour

workday due to her "neurocirculatory disorder causing syncope." Tr. 850.  If these findings are

entitled to controlling weight, they would change the outcome of this case under the sequential

analysis.  Indeed, when the VE was asked to consider the limitations set forth by Dr. Bommana,

he indicated that there were no jobs that the hypothetical individual could perform, primarily due

to the limitation that the individual would need to elevate her legs for one to two hours in an

eight-hour workday.  Tr. 103-06.  Even though the ALJ specifically asked the VE about this

limitation and the VE responded that such a limitation would preclude all work, the ALJ failed to

discuss this limitation anywhere in her opinion or explain why she rejected it.  This failure was

prejudicial to Baker because, had the ALJ followed the treating physician rule, the outcome of

the case may have been different.  The Commissioner's *post hoc* rationale is not a sufficient substitute for a reasoned analysis by the ALJ in this case.

In sum, the ALJ failed to follow the treating physician rule because she did not assign any weight to the opinions of Dr. Bommana or provide any good reasons for discounting those opinions.  The ALJ's failure to explain her decision with regard to the opinions of Dr. Bommana has, in turn, deprived the Court of the ability to conduct a meaningful review of the ALJ's decision.  Accordingly, the case is remanded for proper application of the treating physician rule to Dr. Bommana's opinion.

## C.    Other Issues

Baker also argues that the ALJ failed to explain adequately the basis for her RFC determination, including describing the weight that she gave to the opinion of the state agency consulting physician.  The Court declines to address those arguments because, on remand, the ALJ's evaluation of Dr. Bommana's opinion under the treating physician rule may impact her findings with regard to Baker's RFC, as well as her findings under the remaining steps of the sequential analysis.  *See Trent v. Astrue*, Case No. 1:09CV2680, 2011 WL 841538, at *7 (N.D. Ohio March 8, 2011) (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability evaluation).  It should be noted, however, that opinions from agency medical sources are considered opinion evidence.  20 C.F.R. §§ 404.1527(e), 416.927(e).  The regulations mandate that "[u]nless the treating physician's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the administrative law judge must do for any opinions from

treating sources, nontreating sources, and other nonexamining sources who do work for us." 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).

### VII.  Conclusion

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff Catherine R. Baker's applications for DIB and SSI is **REVERSED AND REMANDED** for further proceedings consistent with this Opinion and Order.[8]

Dated: April 17, 2013

Kathleen B. Burke
United States Magistrate Judge

---

[8] This Opinion and Order is not nor should it be construed as an order requiring a determination on remand that Baker was in fact disabled during the relevant period.